### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE:

DEBRA L. PETERSEN                                     CASE NO.     03-34101-LMK

     Debtors                                            CHAPTER 7

JAMES B. RUTLAND and
CONSTANCE D. RUTLAND,

     Plaintiffs

v.                                                    ADVERSARY NO. 04-03009-LMK

DEBRA L. PETERSEN,

     Defendant.
_____/

### MEMORANDUM OF OPINION

THIS MATTER came on for hearing on January 26, 2005, upon Plaintiffs James and Constance Rutland's Complaint Objecting to Discharge of Debtor. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 151 and 157(b)(2)(J). This Memorandum Opinion constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052. For the reasons set forth herein, the Rutlands' Complaint will be dismissed, and the Debtor's discharge will be granted.

### FINDINGS OF FACT

Debra Petersen (the Debtor) married Russell Petersen (Rusty) in 1980.  Rusty was from a very affluent Louisiana family, as his grandfather had founded a well-known insurance company. After they married, the Petersens lived off of Rusty's trust fund annuity, which in the early years of their marriage was worth approximately seven million dollars.  Although the Debtor has a 2-year nursing degree, she never worked outside the home after her marriage.

The Petersens decided to invest in real estate in Destin, Florida, and in August 2001, they bought approximately five million dollars worth of property in Destin to rent to vacationers. After the events of September 11, 2001, tourism in Destin and elsewhere declined, and the

Petersens were not able to realize the income from their property that they had anticipated.  They were running a sixty- to eighty-thousand dollar a month negative cash flow, and they ended up selling the Destin properties at a loss. The sale of one of the Destin properties is what gave rise to the Rutlands' claim against the Debtor. During late 2001, the Petersens separated after encountering marital difficulties, and they were divorced in Louisiana, a community property state, on January 31, 2002.

According to the Settlement of Community, the Debtor received half of the remaining annuity, which amounted to $700,000, and a $35,000 Mainstay mutual fund.  She also received a lot of debt, including debts for an airplane, a yacht, a house, a Porsche and a Mercedes,  school expenses for the Petersen children, and lots of credit card debt. Even after the divorce, the Debtor did not work; rather, she continued to live off of the annuity as she had during her over twenty-year marriage.  In late 2001, she met John Lomax, who was working as a waiter at a local restaurant.  They began a relationship, and Lomax moved in with Debra near the end of 2001, after which she testified they lived together as though they were married.  After moving in with the Debtor, Lomax only worked for a couple of months.  The Debtor supported him for the remainder of their relationship.

The only money the Debtor  used to support herself and Lomax was the money from the annuity.  The annuity did not pay out a specific amount on any specific time table; rather, Debra was allowed to draw from the annuity amounts at her discretion up to ten or twelve times per year.  Her annuity was used to pay not only ordinary living expenses, but also some of Lomax's individual bills.  Although not a signatory on Debra's bank accounts, Lomax, with Debra's tacit permission, used her bank accounts as his own, many times without informing Debra of his actions.  He would sometimes make phone payments to his individual creditors without her knowledge.  Lomax and Debra did not have any joint creditors, and neither was indebted to the other.

In the summer of 2003, Debra began experiencing a myriad of personal problems.  The

Rutlands were suing her for allegedly concealing defects in a Destin home she and her former husband had sold to them.  Her daughter had to be seen by a psychologist and medicated.  Her first cousin died.  Her father was diagnosed with terminal cancer and was going through experimental chemotherapy and drugs, which eventually killed him.  Her aunt, who helped raise her and her children, also died after a protracted illness.  During the course of her father's and aunt's illnesses, Debra made many trips to Louisiana and Texas to visit with and take care of her family members. Because of the stress of all of these events, Debra sought medical help and was placed on an anti-depressant, Wellbutrin XL, 300 mg.  She and Lomax both testified that the drug made her "loopy," and she stated that she stopped taking it because of the memory loss and confusion that were side effects.

In addition to her family and medical problems, Debra was experiencing financial difficulties and could not afford to pay her debts.   Creditors were making demands and filing lawsuits against her.  Her brother-in-law gave her some money to hire an attorney, and on October 23, 2003, she decided to file for bankruptcy.  She filed her Chapter 7 bankruptcy petition on November 21, 2003, and by this time, her annuity, which was her sole source of support, was worth only around  $47,000.  The Rutlands filed this Complaint objecting to the Debtor's discharge on March 12, 2004, alleging several grounds for denial of the Debtor's discharge.  The basis of the Rutlands' objections are omissions of property and failure to disclose income, gifts, and transfers on the Debtor's schedules and statement of financial affairs.  Prior to trial, the parties filed a Stipulation Regarding Issues for Trial, which narrowed to nineteen the factual issues for resolution at trial.  The Court announced its findings regarding some in open court, and the Rutlands conceded a lack of evidence regarding others either during trial or in their post-trial brief, leaving only eight issues remaining for consideration.  Out of these eight remaining issues, four involve payments made by or for the benefit of John Lomax and therefore may be considered together.  Therefore, only five separate issues remain. Only the Debtor and John Lomax testified at trial, and I find that their testimony was both credible and uncontroverted.

**CONCLUSIONS OF LAW**

The five remaining issues to be considered by the Court in this case involve what the Plaintiffs allege are knowing and fraudulent misstatements in or omissions from the Debtor's schedules or statement of financial affairs that would constitute cause to deny the Debtor's discharge under 11 U.S.C. §727(a)(4)[1].   Exceptions to discharge are construed strictly against the complaining party and liberally in favor of the debtor in order to effectuate the fresh start policy that is the primary purpose of the Bankruptcy Code.  *In re Vina*, 283 B.R. 803, 807 (Bankr. M.D. Fla. 2002).  Although exceptions to discharge are not intended as a punishment for a debtor's innocent mistakes or inadvertance, *In re Hoflund*, 163 B.R. 879, 882 (Bankr. N.D. Fla. 1993), the fresh start policy of the Code is reserved for the "honest, but unfortunate" debtor.  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Section 727(a)(4) provides that "the court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  A false oath or account includes false statements or omissions on a debtor's schedules, or false statements by a debtor under examination. *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992).  In order to deny a discharge to a debtor under 727(a)(4), the Plaintiff must prove all of the elements by a preponderance of the evidence.  Fed. R. Bankr. P. 4005.  The Plaintiff must show  that in making a false oath or account, the debtor "acted with  knowledge and with  the intent to defraud the estate." *Hoflund*, 163 B.R. at 882.   Such intent may be inferred from the circumstances of the case, and this Court has previously found fraudulent intent in cases where the conduct of the debtors demonstrates a pattern or practice of deception, even if one omission standing alone would not be sufficient to deny a discharge . *Id*.  Failure to list even a worthless or valueless item may give rise to a denial of discharge under §727(a)(4)(A), if such failure was with

---

[1]  The Plaintiffs' Complaint alleges other grounds for denial of the Debtor's discharge, but the issues framed by the parties both in the stipulation, at trial, and in post-trial briefs, in addition to this Court's findings in open court, reduced the allegations to just five of those initially pled under 727(a)(4).

the requisite intent. *In re Chalik,* 748 F.2d. 616, 618 (11th Cir. 1984). Debtors must make full and complete disclosures on their bankruptcy schedules, and it is not up to a debtor to decide upon the relevance or value of assets or information before including it on his or her schedules. *Hoflund*, 163 B.R. at 883. This requirement enables the trustee and creditors to rely on the information supplied by the debtors. *In re Diodati*, 9 B.R. 804, 807-808 (Bankr. Mass. 1981). Whether or not a debtor has made a false oath as contemplated by §727(a)(4) is a fact-intensive inquiry, and the Court will consider each remaining alleged omission or misstatement individually and then cumulatively to determine whether the Plaintiff has met its burden of proving the elements of a false oath of the type sufficient to deny the debtor her discharge.

First, the Plaintiffs allege that the Debtor made a false oath by listing the 1994 Lexus on paragraph 14 of her statement of financial affairs as being held by her but belonging to someone else. Paragraph 14 states that "[a] 1994 Lexus ES 300 is titled in the name of debtor for the sole purpose of obtaining a tag and insurance." The Plaintiffs take issue with the Debtor's assertion that she held only bare legal title to the vehicle, and aver that the Debtor should have listed the Lexus as an asset on Schedule B. However, if a debtor has only bare legal title to a vehicle, then such vehicle is not property of the estate *In re Smith*, 73 B.R. 211 (Bankr. N.D. Fla. 1986). Both the Debtor's and Lomax's uncontroverted testimony supports the Debtor's characterization of her interest in the Lexus. Lomax testified that the Debtor did make one payment on the vehicle in order to receive the title, but that she only paid off the remaining balance of approximately $2800, when the car was worth an estimated $10,000. Lomax futher testified that, at the time title was transferred, his father was in possession of the car and remained in possession of the car for some time after the transfer. Lomax stated that when the time came to renew the car registration, he was not able to renew the registration because his license was suspended, and in order to continue to allow his father to retain and operate the vehicle legally, the Debtor agreed to title and insure the vehicle in her name. The Debtor's initial disclosure of the vehicle gave the Plaintiffs an opportunity to examine the Debtor at the 341 Meeting, at the 2004 Examination, and at trial

regarding the ownership of the vehicle, and no evidence other than the title was brought forth by the Plaintiff to show how the Debtor's statement in paragraph 14 was false.  Therefore, I accept the testimony of the Debtor and Lomax and conclude that the disclosure of the automobile in paragraph 14 of the Debtor's statement of financial affairs was appropriate and sufficient and thus not a knowing and fraudulent false oath that would constitute reason to deny the Debtor her discharge under 727(a)(4).[2]

Next, the Plaintiffs take issue with the Debtor's omission of a cubic zirconium ring (the CZ ring) from her Schedule B.   The CZ ring was not included in an initial appraisal of the Debtor's personal property from which the Debtor and her attorney compiled Schedule B.  The Debtor stated that she did not know why the CZ ring was not included on the initial appraisal and that its omission from Schedule B was an oversight.  The ring was eventually appraised at $93.40.  The Debtor also testified that she wore the ring to both her 341 Meeting and her 2004 Exam, and that she was not trying to hide it.  Subsequent disclosure of a previous omission can be evidence of innocent intent. *In re Talibaban*, 289 F.2d 793, 797 (2d Cir. 1961).  In light of the relatively small value of the ring, and after consideration of the Debtor's behavior with regard to the ring, I accept the Debtor's uncontroverted testimony and find that the omission of the CZ ring from Schedule B was an oversight. Therefore, I conclude that the Debtor did not knowingly and fraudulently omit the CZ ring from her schedules, and she will not be denied her discharge on this basis.

The Plaintiffs next allege that the Debtor knowingly and fraudulently omitted a debt owed to her by Rusty Petersen from her schedules.  The Debtor listed two separate obligations owed to her by Rusty in paragraphs 17 and 20 of Schedule B.  The first is related to a share of a tax refund that she may or may not be entitled to, and the second, which was

---

[2]  The Court also notes that all transactions related to this vehicle, including the payment of the car loan and the transfer of the vehicle to the Debtor's name, took place more than one year pre-petition.

-6-

also included in the Debtor's response to paragraph 10 of her statement of financial affairs, references her entitlement to share of the proceeds from the Petersens' marital home in Tallulah, Louisisana, if and when this property is sold. The Plaintiff argues that there is a third obligation that arose out of the Settlement of Community, in which the Debtor was awarded $47,975.59 in order to equalize the credit card indebtedness of the parties.  At the time of the divorce, the Debtor apparently owed more on credit cards in her name than her ex-husband owed on credit cards in his name and this was the Louisiana state court's attempt to apportion the debt equally between the parties.  The Debtor testified that a portion of this amount had been paid but that she was unsure of the amount.  She also was unsure if Rusty would still owe the balance of this award because of her bankruptcy filing, which would generally discharge all of the Debtor's credit card debt.  The Debtor testified that she did not consider this a debt owed to her, because she thought that if she no longer owed the credit card debt, then Rusty did not owe it anymore either.  Had the Debtor been trying to hide the fact that Rusty owed her money or had she been trying to "protect" him in some way, she probably would not have listed the other two debts on Schedule B.  The Debtor testified that she did not believe that Rusty would still owe the money since she filed bankruptcy, and her testimony was again uncontroverted.   Whether or not this amount could or should have been listed on Schedule B is, in the end, irrelevant, as I accept the Debtor's testimony and conclude that the omission of this "debt," if it proved to be a debt, was not knowing and fraudulent, and thus also cannot form the basis of a 727(a)(4) denial of discharge.

The Plaintiff's next contention is more complicated and thus requires more discussion than the previous three.  The Plaintiffs allege that the Debtor's listing of no income on Schedule I of the petition as well as listing no income for 2003 on paragraph 2 of the statement of financial affairs was a knowing and fraudulent misstatement.  The Plaintiffs argue that "income" required to be listed in Schedule I includes all forms of income

recognized under the United States Internal Revenue Code, 26 U.S.C. 61(a), which includes annuities within its general definition of income.

On the other hand, the Debtor argues that since the Debtor received no income from work or investments, and lived solely on her annuity, it was entirely appropriate to list no income.  In support of her decision to list no income, the Debtor offered into evidence a dictionary definition of income as a "gain or recurrent benefit measured in money that derives from capital or labor."  (Exh. 3, from Merriam-Webster OnLine Dictionary, www.webster.com).   The Debtor argues that the amount of the annuity at the time of filing, $47,616.59, was properly listed as an asset on Schedule B and exempted on Schedule C pursuant to Fla. Stat.§222.14, without objection.  She stated that she did not earn any interest or other money on the money she had in the annuity, and argues that absent such earnings on capital invested, she received no "income" as contemplated by Schedule I. She characterizes her annuity draws as mere depletion of capital, which is not called for anywhere in the schedules or statement of financial affairs (other than Schedule B).  The Debtor also argues that Schedule I requires disclosure of current income, but because of her deteriorated financial condition at the time she filed, she was no longer able to draw from annuity as she had in the past.

Again, the Court is not required to reconcile whether the annuity draws should have been listed as "income" on the Debtor's schedules or statement of financial affairs because the Court can dispose of this issue without having to consider this argument.  The Plaintiffs have again presented no evidence that the failure to list any income was done with knowledge and with  the intent to defraud the estate.  Rather, it is clear that the Debtor relied on the counsel of her attorney in deciding that her annuity draws did not constitute income that was required to be disclosed.  Reliance on attorney advice absolves a debtor of the fraudulent intent required by the false oath discharge exception if such reliance was reasonable and the attorney was fully informed when he gave such advice, especially in a

case where neither the debtor nor her attorney manifested any ill intent.  *In re Geller*, 314 B.R. 800, 807 (Bankr. D.N.D. 2004).  Without determining whether or not the Debtor's definition of "income" is the better one, the Court recognizes that the Debtor's position is reasonable.  Debtor's counsel was aware of the annuity and the circumstances surrounding it, as evidenced by its being listed as an asset in Schedule B and properly exempted under Schedule C.  Therefore, any failure of the Debtor to list it as "income" would be justified by her reliance on her attorney's advice.

Also, there is no evidence of fraudulent intent on the part of the Debtor or her attorney with regard to her annuity payments.  The Plaintiffs have presented no evidence other than the mere failure to list the payments as income in support of their assertion that such omission or misstatement was made knowingly and fraudulently.  Although the Plaintiffs invite the Court to infer from the circumstances intent to defraud, the Court makes the opposite inference.  The circumstances surrounding the annuity and the treatment of it lead me to conclude that the Debtor had no intent to deceive anyone.  Her listing the balance of the annuity on Schedule B and exempting it on Schedule C disclosed the existence of the annuity to any who cared to see, including the Plaintiffs and the trustee.  Further, the Debtor presented her bank account records and other information requested by the Plaintiffs regarding her finances at the 2004 examination.   No attempt was made to conceal her finances or the source of her support.  Last, but certainly not least, the Debtor had no motive to conceal her annuity payments, as the annuity was exempt under Florida law.  Fla. Stat. §222.14; *See, also, In re McCollam*, 986 F.2d 436 (11th Cir. 1993).  Therefore, I conclude that whether or not the annuity draws constituted "income" as contemplated by Schedule I or Paragraph 2 of the Statement of Financial Affairs, the omission of such draws was not done knowingly and fraudulently and thus the Plaintiffs attempt to deny the Debtor's discharge under 727(a)(4) for failure to list any income must fail.

Finally, the Plaintiffs contend that certain payments made to or for the benefit of

John Lomax by the Debtor should have been disclosed in various places throughout the Debtor's statement of financial affairs. The Plaintiff argues that the Debtor made payments to or for the benefit of Lomax and/or made gifts to Lomax that should have been listed in paragraph 3, 7, or 10 of the statement of financial affairs. First, I conclude that since no evidence has been presented that suggests that Lomax was a creditor of the Debtor or that he and the Debtor jointly owed any creditor, no payments were required to be disclosed in paragraph 3. However, the substance of the Plaintiffs argument focuses on payments made to other creditors and support provided directly to Lomax which the Plaintiff contends were knowingly and fraudulently omitted from the Debtor's statement of financial affairs.

First, the Plaintiff argues that payments made from the Debtor's bank accounts to Lomax's individual creditors, Bank of America and Capital One, and payments made from the Debtor's accounts to Porsche Financial for lease payments on the vehicle owned by the Debtor but primarily used by Lomax, were knowingly and fraudulently omitted from the statement of financial affairs. However, the evidence presented at trial suggests otherwise. Lomax testified that he made "check-by-phone" payments to these creditors for his individual debts and for some of the lease payments to Porsche. He further testified that he did not tell the Debtor of his making these payments by phone. The Debtor stated that in compiling information for her schedules and statement of financial affairs, she used the carbon copies from her checkbook to reconstruct her financial history. Since the payments made by Lomax were made without paper checks, it is entirely reasonable to conclude that the payments omitted from paragraph 3 were innocent omissions based on the method in which the Debtor reconstructed her accounts. Although it would have been better had the Debtor either known where her money was going in the first place or used bank statements to reconstruct her history, this does not rise to the level of a reckless disregard for the truth which indicates a fraudulent intent as this Court previously found in *Hoflund*, 163 B.R. at 883 (in which the Debtor–a university professor– gave doubtful testimony regarding his

income and was generally evasive).  I find that the Debtor disclosed all that she knew and did not try to keep the Plaintiffs from finding out information she may have forgotten.

Next, the Plaintiffs take issues with the support provided by the Debtor to John Lomax and allege that money spent on such support should have been listed as a gift to Lomax.  The Debtor and Lomax testified that they lived together for four years as if they were married.  The Debtor further testified that she did not consider the support she provided to Lomax to be a gift; rather, she considered him part of her family.  It is not common or required for a Debtor to list support provided to family members living in the household as gifts.  It is doubtful that the Debtor kept up with amounts spent on Lomax, especially since he had free reign over her finances, as is not uncommon in a living-together relationship.  It may have been better had the Debtor listed all of this on her statement of financial affairs, but, again, the simple failure to list that which may have been required is not enough to justify a denial of a debtor's discharge.  The Plaintiffs also must prove that the false oath was made knowingly and fraudulently.

The Plaintiffs again invite the Court to infer fraudulent intent from the circumstances surrounding the payments to or for the benefit of John Lomax, and the Court must again decline the invitation.  There was no benefit to the Debtor in concealing anything.  All of the payments made to, for the benefit of, or in support of Lomax were made with funds from the Debtor's annuity–exempt funds.  The Debtor thus has no motive to be less than candid with the Court and with her creditors.  Although such funds were exempt (and therefore such transfers not fraudulent as a matter of law), the inquiry in a denial of discharge situation is focused on intent rather than outcome.  *See Chalick*, 748 F.2d 616.  Therefore, if the Debtor had the intent to deceive her creditors,  a discharge could be denied regardless of the fact that debtor's fraudulent actions (or inactions) were not necessary to achieve the Debtor's desired result. While the Debtor may not have been prudent in her dealings with Lomax or with her money, there is simply not enough evidence to suggest that she possessed the

requisite intent to justify denying her discharge.

After considering each individual alleged omission or misstatement, the Court will consider whether, taken together, all of the alleged omissions or misstatements show a disregard for the truth that would justify a denial of the Debtor's discharge under 727(a)(4). As with each individual omission or misstatement, I conclude that even taken together, the Debtor's misstatements and omissions were relatively minor and were simply mistakes. The Debtor's finances were complicated, so there was a large amount of financial information to assimilate and include in her schedules and statement of financial affairs. She was very recently divorced and had moved a few times. Her financial documents and information was in disarray, and she is also not financially sophisticated. In addition, both the Debtor and Lomax offered uncontroverted testimony that during the time period when the Debtor was preparing with her statements and schedules, she was experiencing family and personal crises and was medicated for her depression. They further testified that she experienced confusion and memory loss as a side effect of the medication, and Lomax stated that she appeared "loopy" and "out of it." Her medical status coupled with the complexity of her financial affairs further support the conclusion that the mistakes and omissions in her schedules and financial affairs were simply oversights.

Further, the Complaint and the Stipulation each listed many more alleged omissions or misstatements than the five which remained after the others were either resolved by the Court's announcement of its findings in open court or abandoned by the Plaintiffs before or during the trial or in post-trial briefs . I find it of some significance that upon further review of the initial claims, it was revealed to the Court and the Plaintiffs that many of the Debtor's alleged omissions or misstatements initially pled by the Plaintiffs were in fact disclosed within the Debtor's statement of financial affairs or schedules, albeit not in the exact place where the Plaintiff expected or desired such information to be disclosed. Discrepancies between where the Plaintiff thinks is a more accurate place to disclose information and

where the information was actually disclosed does not evidence any pattern or practice of deceit on the part of the Debtor.  She was not attempting to hide the information by placing it in the "wrong" place; if she were attempting to deceive the Court and her creditors, it would not have been listed at all.   The Debtor made a sincere effort to truthfully disclose her financial affairs and transactions.  I find no evidence of any knowing or fraudulent misstatement or omission, and therefore no reason to deny the Debtor her fresh start.  The Debtor, although not always prudent, appears to have been candid with the Court and with her Creditors, and she will not be punished for her honest mistakes or her imprudence by being denied a discharge.

CONCLUSION

I conclude that the Plaintiffs have failed to meet their burden of proving the elements of a denial of discharge for false oaths under 727(a)(4).  I can find no evidence that any omissions or misstatements in the Debtor's schedules or statement of financial affairs were made knowingly and fraudulently or with the intent to deceive.  Therefore, the Plaintiff's Complaint will be dismissed and the Debtor shall receive her discharge.  A separate final judgment will be entered in accordance herewith.

DONE and ORDERED at Tallahassee, Florida this _____26th_____ day of April 2005.

_____
LEWIS M. KILLIAN, JR.
U.S. Bankruptcy Judge

cc:    All parties in interest